**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

ROBERT KAIL,                              )       CASE NO. 5:13-CV-00838
                                          )
          Plaintiff,                      )
                                          )
                                          )       MAGISTRATE JUDGE
          v.                              )       VECCHIARELLI
                                          )
CAROLYN W. COLVIN,                        )
     Acting Commissioner of Social        )
     Security,                            )       **MEMORANDUM OPINION AND**
                                          )       **ORDER**
                    Defendant.

     Plaintiff, Robert Kail ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(I), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

     On August 3, 2010, Plaintiff filed applications for POD, DIB, and SSI, alleging a

disability onset date of February 29, 2008.  (Transcript ("Tr.") 9.)  These applications

were denied initially and upon reconsideration, and Plaintiff requested a hearing before

an administrative law judge ("ALJ").  (*Id.*)  On January 5, 2012, an ALJ held a video

hearing.  (*Id.*)  Plaintiff was represented by an attorney and testified.  (*Id.*)  A vocational

expert ("VE") also testified.  (*Id.*)  On January 20, 2012, the ALJ found that Plaintiff was

not disabled.  (Tr. 6.)  On February 12, 2013, the Appeals Council declined to review the ALJ's decision, and that decision became the Commissioner's final decision.  (Tr. 1.)  On April 15, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. Nos. 17, 20.)

Plaintiff asserts the following assignment of error:  The ALJ improperly applied the treating physician rule.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in January 1958 and was 50-years-old on the alleged disability onset date.  (Tr. 18.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as a construction laborer. (*Id.*)

### B.    Medical Evidence

#### 1.    Medical Reports

On January 16, 2000, and again on January 17, 2000, Plaintiff presented to the emergency room with complaints of severe cluster headache pain.  (Tr. 301.)  Treatment notes indicate that Plaintiff had several years where he did not have any cluster headaches, but had recently been experiencing severe ones that were occurring only on the right side of his head.  (*Id.*)  Plaintiff was diagnosed with cephalgia and discharged with instructions to have an MRI of the brain and to follow up with Dr. Baghat.  (Tr. 302.)  On January 18, 2000, Plaintiff presented to the emergency room for

2

the third day in a row, again complaining of a severe headache.  (Tr. 307.)  The impression was cephalgia – migraine.  (*Id.*)

On December 6, 2000, Plaintiff was presented to the emergency department with a complaint of right wrist pain related to his work as a construction laborer.  (Tr. 303.) He was diffusely tender over the dorsum of the wrist and when he performed the Phalanx maneuver, it gave him pain and numbness down into his middle finger, consistent with carpal tunnel syndrome.  (*Id.*)  X-rays showed some degenerative joint disease of the wrist but no acute fractures or sublaxations.  (*Id.*)  He was prescribed a wrist splint, Ibuprofen, and Vicodin for the pain.  (*Id.*)

On November 10, 2003, Plaintiff went to the emergency room with complaints of right heel pain for the past three to four weeks.  (Tr. 308.)  X-rays revealed a calcaneal spur, but he was treated for plantar fasciitis.  (*Id.*)

On August 25, 2003, Plaintiff established care with Kindra Browning, D.O.  (Tr. 380.)  In November, Dr. Browning treated Plaintiff for plantar fasciitis.  (Tr. 378.)  He had been started on non-steroidal anti-inflammatory medications and Darvocet, but his condition failed to improve.  (*Id.*)  He received a steroid injection in his heel to help with the pain.  (*Id.*)

Plaintiff visited the emergency room on June 12, 2008, with complaints of a headache.  (Tr. 261.)  He had significant relief with an injection of Demoral with Phenergan.  (*Id.*)  The clinical diagnosis was cephalgia, and Plaintiff was prescribed Percocet and referred to pain management.  (*Id.*)

On November 5, 2008, Plaintiff reported that he had been taking a friend's Percocet for about a week and Darvocet off and on as well.  (Tr. 258.)  He also reported having started on Chantix and having sleeplessness for the past four days with some nausea off and on.  (*Id.*)  Plaintiff complained of some depression but no suicidal thoughts.  (*Id.*)  The clinical diagnosis was anxiety possibly secondary to withdrawal symptoms versus a reaction to Chantix.  (*Id.*)

On May 23, 2010, Plaintiff reported to the emergency room with complaints of back pain.  (Tr. 271.)  A chest x-ray revealed patchy right lower lobe infiltrate, possibly representing pneumonia, with repeat study recommended to rule out underlying mass.  (Tr. 256.)  He was prescribed medication to treat pneumonia.  (Tr. 272.)

On September 2, 2010, Plaintiff presented to the Tuscarawas County Health Department with complaints of cluster headaches that had been diagnosed 10 years prior, for which Plaintiff wanted further work-up, and he also requested evaluation of his back pain.  (Tr. 280.)  Progress notes indicate that Plaintiff was self-employed as a painter at the time and that he had applied for disability.  (*Id.*)  An examination revealed pain in the L4-5 area and expiratory wheezes.  (Tr. 280.)  His diagnoses included cephalgia, lumbar pain, and chronic obstructive pulmonary disease (COPD).  (*Id.*)  Plaintiff received referrals to a specialist for his headaches and a prescription for Ultram for his lumbar pain.  (*Id.*)

X-rays of Plaintiff's lumbar spine from September 2010 revealed significant loss of disc height at L5-S1, multilevel disc space spurring, and facet arthropathy most pronounced at L4-5 and L5-S1.  (Tr. 267.)  X-rays of Plaintiff's cervical spine revealed

4

minimal retrolisthesis of C3 on C4; mild diffuse loss of disc space height, mild disc osteophyte formation, and bilateral facet arthropathy; mild bony neural foraminal stenosis on the left at C3-4 and C4-5 and on the right at C5-6.  (Tr. 268.)

Plaintiff presented to the emergency room on December 20, 2010, with complaints of chronic back pain, chronic cluster headaches, and intermittent shortness of breath. (Tr. 354.)  He received Demerol and Phenergan and a limited supply of Vicodin to be used until he could be seen in the Pain Management Clinic.  (Tr. 355.)  The impression included acute exacerbation of chronic back pain and benign cephalgia, history of cluster headaches.  (*Id.*)

On January 3, 2011, Plaintiff saw Jerome Yokiel, M.D., with complaints of chronic back pain that radiated to both lower extremities.  (Tr. 341.)  Plaintiff reported that he had a history of chronic cluster headaches which had become worse over the past six to eight months.  (*Id.*)  An examination revealed lumbar tenderness, bilateral muscle spasms, and pain with range-of-motion of the lumbar spine.  (*Id.*)  He had increased pain with straight leg raising tests bilaterally.  (*Id.*)  The impression was lumbar radiculopathy, lumbar spondylosis without myelopathy, lumbar disk degeneration, and cluster headaches.  (*Id.*)  Plaintiff completed a Pain Management Center Pain Questionnaire in which he reported a long history of back pain and symptoms made worse by bending, standing, and walking.  (Tr. 330.)  He was started on Vicodin and Zanaflex.  (*Id.*)  On January 10th, 17th, and 24th of 2011, Plaintiff underwent lumbar epidural steroid injections.  (Tr. 334, 336, 338.)

On April 25, 2011, Plaintiff reported chronic daily headaches and chronic back pain with radiation down the lower extremities.  (Tr. 359.)  A computed tomography (CT) scan of Plaintiff's brain was normal with no intracranial abnormalities.  (Tr. 361.)  There was a hyperdensity near the tip of the right internal carotid artery, possibly representing volume averaging or a small aneurysm.  (*Id.*)

At a follow-up with Dr. Yokiel on August 22, 2011, Plaintiff reported continued chronic back pain and intermittent migraine headaches.  (Tr. 358.)  Plaintiff reported that he had been taking his medications as prescribed and did not experience any side effects.  (*Id.*)  An examination revealed tenderness to palpation in the midline lumbar region, pain with range of motion of the lumbosacral spine, and increasing pain with straight leg raising bilaterally.  (*Id.*)  Dr. Yokiel diagnosed chronic migraine headaches, lumbar radiculopathy, and lumbar disk displacement.  (*Id.*)

Plaintiff saw Dr. Yokiel again on November 21, 2011, complaining of chronic back pain and left shoulder pain.  (Tr. 387.)  In addition to lumbar tenderness and limited range-of-motion of the lumbar spine, Plaintiff demonstrated tenderness over the left anterior shoulder and pain with range-of-motion of the left shoulder beyond 45-degree abduction.  (*Id.*)  Neurologically, Plaintiff was intact.  (*Id.*)  Dr. Yokiel's impression was lumbar radiculopathy, lumbar disk displacement, and joint pain in the left shoulder.  (*Id.*)

On November 21, 2011, Dr. Yokiel completed a Physical Residual Functional Capacity Questionnaire on Plaintiff's behalf.  (Tr. 370-374.)  In addition to lumbar radiculopathy, lumbar disc disease, and neck pain, Dr. Yokiel noted that Plaintiff had limb pain and left shoulder pain that was constant but varying in intensity.  (Tr. 370.)  He

6

also noted that Plaintiff's use of opioids could cause drowsiness.  (*Id.*)  Dr. Yokiel opined that Plaintiff was incapable of even "low stress" jobs and that he would constantly experience pain severe enough to interfere with attention and concentration with regard to even simple work tasks.  (Tr. 371.)  He indicated that Plaintiff could stand/walk for about four hours total during an eight-hour workday and that he would need to be able to shift positions at will, walk around for about ten minutes of every 30 minutes that he worked, and take frequent, unscheduled breaks every 30 minutes.  (Tr. 371-372.)  He also indicated that Plaintiff must use an assistive device while engaged in occasional standing/walking.  (Tr. 372.)  Dr. Yokiel opined that Plaintiff was limited to lifting 20 pounds occasionally and 10 pounds frequently and performing no more than occasional looking down, turning head left or right, looking up, or holding his head in a static position.  (Tr. 373.)  He further opined that Plaintiff could only occasionally climb stairs, rarely twist, stoop, or crouch/squat, and never climb ladders.  (*Id.*)  Dr. Yokiel concluded that Plaintiff would likely be absent from work more than four days per month due to his impairments or treatment.  (*Id.*)

On November 29, 2011, an MRI of Plaintiff's left shoulder revealed a partial-thickness tear affecting the articular surface of the supraspinatus tendon as well as moderate acromioclavicular athrosis.  (Tr. 385.)

On December 28, 2011, Dr. Yokiel reiterated his previous residual functional capacity, noting that he had reviewed additional medical records which were consistent with his diagnosis of lumbar radiculopathy, lumbar disc displacement, and left shoulder condition.  (Tr. 391.)

### 2. Agency Reports

7

On October 1, 2010, state agency psychological consultant Karla Voyten, Ph.D., concluded that Plaintiff's depression was not a "severe" impairment.  (Tr. 72.)  Another state agency medical consultant, Tonnie Hoyle, Psy.D., affirmed Dr. Voyten's findings on December 20, 2010.  (Tr. 91.)

On October 5, 2010, state agency medical consultant Eli Perencevich, D.O., concluded that Plaintiff retained the ability to lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; stand/walk for about six hours total during an eight-hour workday; sit for about six hours total during an eight-hour workday; perform no more than occasional crawling, crouching, or stooping and no more than frequent climbing of ramps/stairs, kneeling, or balancing; and no more than occasional reaching overhead bilaterally.  (Tr. 74-75.)  On January 7, 2011, state agency medical consultant Gerald Klyop, M.D., affirmed Dr. Perencevich's findings. (Tr. 94.)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

Plaintiff was a high school graduate.  (Tr. 30.)  He lived with his mother in the basement of a ranch-style house.  (Tr. 33.)  During a typical day, Plaintiff helped his mother, who is handicapped, do the daily chores.  (Tr. 34.)  He did the dishes and weekly shopping and performed other household chores like cooking, vacuuming, dusting, laundry, and mowing the lawn.  (Tr. 34, 36.)  He also drove his mother to and from her medical appointments.  (Tr. 34.)  He was able to dress himself and bathe himself, but with some difficulty.  (Tr. 36.)  Plaintiff attended AA meetings two to three times a week and visited his children regularly.  (Tr. 37.)  He did not attend club

8

meetings, organizational meetings, or religious services.  (*Id.*)  He took his mother to restaurants about two to three times per month and attended professional sports games a few times per year.  (Tr. 38.)  He read about 30-45 minutes each day and did not use a computer.  (Tr. 41-42.)  Plaintiff testified that since his alleged onset date of February 29, 2008, his activities had become more restricted.  (Tr. 43.)  "[I]t takes me longer to do things.  I have to take more breaks.  I can't stand in one spot too long without having to sit down.  And vice versa, I can't sit too long without having to stand up."  (*Id.*)

Plaintiff smoked about a pack of cigarettes each day.  (Tr. 34.)  He has had problems with alcohol abuse.  (Tr. 35.)  His last relapse was in 2009, which lasted about six months.  (*Id.*)

Plaintiff testified that the most significant problem that kept him from working was his lower back pain.  (Tr. 44.)  He took Darvocet and Percocet for the pain.  (*Id.*) Plaintiff had also been to the hospital several times for cluster headaches.  (Tr. 49.) "They get so painful that I have to lay down in a dark room with no noise and just wait until they go away . . . and if they hang on or they're so severe I usually go to the hospital."  (Tr. 50.)

### 2.    Vocational Expert's Hearing Testimony

A vocational expert testified at Plaintiff's hearing.  The VE testified that Plaintiff had past relevant work as a construction laborer, which was unskilled work at a very heavy level of exertion.  (Tr. 56.)

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age who is a high school graduate and who has the same previous work experience as Plaintiff.

(Tr. 57.)  The individual could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (*Id.*)  He could stand and/or walk with normal breaks for about six hours in an eight-hour workday and could sit with normal breaks for a total of six hours in an eight-hour workday.  (*Id.*)  The individual could frequently climb ramps and stairs but could never climb ladders, ropes, or scaffolds.  (*Id.*)  He could frequently balance, occasionally stoop, frequently kneel, occasionally crouch and crawl, and occasionally reach overhead bilaterally.  (*Id.*)  The VE testified that the hypothetical individual could perform the following unskilled jobs: assembler of small products (light, unskilled); cashier (light, unskilled); and inspector and hand packager (light, unskilled).  (Tr. 57-58.)  The VE stated that the list of jobs he named was not an exhaustive list.  (Tr. 58.)

The ALJ presented a second hypothetical to the VE.  (Tr. 58.)  The hypothetical individual had the same age, education, and work experience as the first hypothetical.  (*Id.*)  The individual could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (*Id.*)  He could stand and/or walk with normal breaks for about six hours in an eight-hour workday and could sit with normal breaks for about six hours in an eight-hour workday.  (*Id.*)  The individual would have no restrictions in his ability to push and/or pull except that he could only occasionally push and/or pull with his left upper extremity.  (*Id.*)  He could frequently climb ramps and stairs but could never climb ladders, ropes, or scaffolds.  (Tr. 59.)  He could frequently balance, occasionally stoop, frequently kneel, and occasionally crouch and crawl.  (*Id.*)  He could occasionally reach overhead with his right upper extremity but could never reach overhead with his left upper extremity.  (*Id.*)  He could frequently finger and handle with his right upper

10

extremity.  (*Id.*)  The individual would need to avoid concentrated exposure to extreme cold, vibration, and respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation.  (*Id.*)  He should avoid all exposure to hazards such as dangerous moving machinery and unprotected heights and would be limited to simple, routine, repetitive tasks involving only simple work-related decisions and, in general, relatively few workplace changes.  (*Id.*)  The VE testified that the inspector and hand packager job as well as the cashier job would remain, but the assembler of small products job would not remain because it requires constant bilateral handling.  (*Id.*)  An alternative job that the individual could perform would be an assembler of electrical accessories.  (Tr. 60.)

The VE testified that an individual who would be off-task 20 percent of the day would not be considered to be competitively employable.  (Tr. 60.)  He further testified that an individual who missed three days of work per month would generally be precluded from competitive work.  (*Id.*)

Plaintiff's attorney asked the VE to assume a hypothetical individual who would have to use a cane or other assistive device while engaging in occasional standing and walking.  (Tr. 62.)  The VE testified that the individual could still perform the cashier job, the inspector and hand packager job, and the assembler of electric accessories job, as those jobs could be done sitting or standing.  (*Id.*)  When asked if the hypothetical individual had to stand to relieve back pain and perform the job using a cane or another assistive device, the VE testified that the individual would not be able to perform the functions of the jobs he named.  (Tr. 63.)

### III.   STANDARD FOR DISABILITY

11

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

12

prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant's insured status for purposes of entitled to a period of disability and disability insurance benefits under title II of the Social Security Act expires on September 30, 2010.

2.    The claimant has not engaged in substantial gainful activity since February 29, 2008, the alleged onset date.

3.    The claimant has the following severe impairments: (1) degenerative disc disease and osteoarthritis of the lumbosacral spine, per x-rays on September 3, 2010; (2) mild degenerative disc disease an osteoarthritis of the cervical spine, per x-rays on September 3, 2010; (3) partial thickness tear affecting the articular surface of the supraspinatus tendon and moderate acromioclavicular athrosis of the left shoulder, per an MRI on November 29, 2011; (4) degenerative joint disease of the right wrist, per x-rays on December 6, 2000; (5) history of right carpal tunnel syndrome, based on diagnosis made on December 6, 2000, without EMG confirmation or continuing treatment; (6) chronic obstructive pulmonary disease with tobacco abuse (COPD); and (7) history of headaches.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that the claimant has the following residual functional capacity, which has been the case at all times since the amended alleged onset date of February 29, 2008. He can lift and/or carry twenty pounds occasionally and ten pounds frequently.  He can stand and/or walk with normal breaks for about six hours in an eight-hour workday.  He has no restrictions in his ability to push and/or pull (including the operation of hand and/or foot controls), other than as restricted by his limitations on lifting and/or carrying and except that he can only occasionally push and/or pull with his left upper extremity.  He can frequently climb ramps and stairs.  He can never climb ladders, ropes, or scaffolds.  He can frequently balance and kneel.

He can occasionally crouch, stoop, and crawl.  He can only occasionally reach overhead with his right upper extremity.  He can never reach overhead with his left upper extremity.  He can frequently finger with his right upper extremity.  He can frequently handle with his left upper extremity.  He needs to avoid concentrated exposure to extreme cold.  He needs to avoid concentrated exposure to vibration.  He needs to avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, poor ventilation, etc.  He should avoid all exposure to hazards such as dangerous moving machinery and unprotected heights.  He is limited to simple, routine, repetitive tasks, involving only simple, work-related decisions, and in general, relatively few workplace changes.

6. The claimant is unable to perform any past relevant work, which has been the case at all time since the alleged onset date of February 29, 2008.

7. The claimant was born in January 1958 and was 50-years-old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. The claimant's past relevant work was unskilled.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from the alleged onset date of February 29, 2008, through the date of this decision.

(Tr. 11-19.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

14

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignment of Error

Plaintiff takes issue with the ALJ's evaluation of Dr. Yokiel's residual functional capacity (RFC) opinion from November 21, 2011.  (Tr. 370-374.)  Specifically, Plaintiff argues that the ALJ violated the treating physician rule by failing to conduct a controlling weight determination and failing to provide "good reasons" for discounting Dr. Yokiel's opinion.  Furthermore, Plaintiff contends that the ALJ erred by assigning "some weight"

to the opinion of non-examining state agency physician Dr. Klyop without considering the fact that Dr. Klyop did not review Dr. Yokiel's RFC opinion before rendering his RFC opinion.  The Court will address each issue separately.

### 1.  Whether the ALJ Violated the Treating Physician Rule by Giving Less Than Controlling Weight to the Opinion of Dr. Yokiel.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

Here, although the ALJ considered Dr. Yokiel a treating source, he did not give Dr. Yokiel's opinion controlling weight.  (Tr. 17.)  Rather, the ALJ stated that he did not give "significant weight" to Dr. Yokiel's opinion that Plaintiff could not even perform low

stress jobs.  (*Id.*)  He further explained that, despite Dr. Yokiel's treatment relationship

with Plaintiff, he assigned "little weight" to Dr. Yokiel's opinion due to its inconsistency

with the record.  (*Id.*)  Thus, Plaintiff's argument that the ALJ failed to conduct a

controlling weight analysis is without merit.  The fact that the ALJ used the term

"significant weight" rather than "controlling weight" does not necessitate remand of

Plaintiff's case, as the ALJ made the degree of deference he gave to Dr. Yokiel's

opinion sufficiently clear: He noted that he was not giving significant weight to Dr.

Yokiel's opinion, indicated that he was giving the opinion little weight, and explained

why he considered Dr. Yokiel's opinion not well-supported and inconsistent with other

substantial evidence in the record.  As a result, remanding Plaintiff's case on the basis

that the ALJ did not conduct a controlling weight analysis would be futile, as the ALJ

was sufficiently clear in explaining the deference he gave to Dr. Yokiel's RFC opinion.

Furthermore, the ALJ did not err in declining to assign controlling weight to Dr.

Yokiel's opinion, because he gave good reasons for doing so and substantial evidence

supports that conclusion.  The ALJ explained that, despite Dr. Yokiel's treatment

relationship with Plaintiff, Dr. Yokiel's opinion was entitled to little weight because "his

assessment is inconsistent with the record as a whole (including the objective medical

evidence and his activities of daily living, as described in detail above), and appears to

be based primarily on the claimant's subjective allegations, which are not fully credible."

(*Id.*)  The ALJ continued:

> As discussed above, the evidence of record found no evidence of
> lower extremity radiculopathy relating to the claimant's lumbar
> degenerative disc disease.  There is no indication that the claimant
> requires an ambulatory aid to walk, and there has been no
> prescription for such a device.  Furthermore, there is nothing in the

> record to suggest that the claimant has any trouble sitting for at least six hours in an eight-hour workday; I note that the claimant sat through the entire hearing which lasted the better part of an hour, without displaying any appreciable discomfort.  If one reads Dr. Yokiel's opinion literally, the claimant would be lying down for half of each day, due to pain and other symptoms.  There is nothing in the record, either objective findings or clinical signs, or otherwise, to support such an extreme limitation.  Thus, the substantial weight to [sic] the medical record and the record as a whole does not support Dr. Yokiel's opinion.

(Tr. 17.)

As the ALJ explained, substantial evidence in Plaintiff's record does not support Dr. Yokiel's extreme opinion regarding Plaintiff's limitations.  For example, while Dr. Yokiel opined that Plaintiff would need an assistive device when engaging in occasional standing or walking, Plaintiff has presented no evidence showing that Dr. Yokiel or any other physician had ever prescribed Plaintiff an ambulatory aid.  (Tr. 372.)  Moreover, Plaintiff made no mention in his testimony that he used an assistive device, and use of such a device is inconsistent with Plaintiff's testimony that he mows the lawn, shovels snow, cleans laundry, washes dishes, and does all of the grocery shopping.

Furthermore, the ALJ noted that the objective medical evidence does not support Dr. Yokiel's unduly restrictive limitations on standing/walking and sitting.  (Tr. 14, 16-17.)  While the ALJ acknowledged that Plaintiff experiences some degree of lower back pain, as he has presented with positive straight leg raise testing and tenderness throughout his lumbar spine, the ALJ concluded that Plaintiff's condition does not warrant the extreme limitations assessed by Dr. Yokiel.  (Tr. 14.)  The ALJ specifically noted that x-rays of Plaintiff's lumbar spine showed degenerative disc disease, but that there have been no MRI findings of disc herniation, nerve root compression, or severe central

18

spinal or neural foraminal narrowing that would better support Plaintiffs allegations of debilitating lower back pain.  (*Id.*)  Plaintiff's physical examinations consistently showed no neurological abnormalities; he repeatedly had intact motor strength, sensation, and reflexes in his lower extremities upon examination; and Dr. Yokiel found on more than one occasion that Plaintiff's neurological examinations were unremarkable.  (Tr. 14, 16-17, 261, 269, 341, 354, 358, 359, 364, 387.)

The ALJ also explained how Plaintiff's testimony about his physical abilities was inconsistent with Dr. Yokiel's RFC.  The ALJ noted that "[i]f one reads Dr. Yokiel's opinion literally, the claimant would be lying down for half of each day, due to pain and other symptoms."  (Tr. 17.)  Dr. Yokiel's opinion is therefore inconsistent with Plaintiff's testimony that he helped care for his handicapped mother, performed yard work, completed household chores, assisted his friend with painting jobs, shopped in stores, and attended professional sporting events located about fifty miles from his house.[1] (Tr. 16.)  The ALJ concluded that such activities "are not consistent with [Plaintiff's] allegations of an inability to lift or carry a significant amount of weight and an inability to be on his feet for prolonged periods."  (*Id.*)  For the foregoing reasons, the ALJ did not err in providing little weight to Dr. Yokiel's opinion, because he gave good reasons for doing so: Dr. Yokiel's opinion was in conflict with substantial evidence in the record and with Plaintiff's own testimony regarding his daily activities.

---

[1]     The ALJ specifically addressed Plaintiff's testimony that he traveled to sporting events in Cleveland, Ohio, from his home in New Philadelphia, Ohio.  "Presumably, this required the claimant to sit in the car for at least an hour, walk from the parking lot to the stadium, and navigate the stairs therein, etc., not to mention sitting in the stands for the duration of the games themselves."  (Tr. 16.)

**2.    Whether the ALJ Erred by Giving Some Weight to the Opinion of State Agency Physician Dr. Klyop.**

Plaintiff argues that the ALJ erred by giving "some weight" to non-examining state agency physician Dr. Klyop while giving only "little weight" to the opinion of treating physician Dr. Yokiel.  According to Plaintiff, given that Dr. Klyop rendered his RFC opinion in January 2011 and Dr. Yokiel did not render his RFC opinion until November 2011, remand is appropriate because the ALJ did not indicate in his opinion that he at least considered the fact that Dr. Klyop had not reviewed all of the evidence in the record before giving his opinion more weight than Dr. Yokiel's opinion.

In making this argument, Plaintiff cites *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009), where the Sixth Circuit held that the ALJ's decision to accord greater weight to state agency physicians over the plaintiff's treating sources was reversible error, because the consultants' opinions were based on an incomplete case record.  Plaintiff also relies on *Stacey v. Comm'r of Soc. Sec.*, 451 Fed.Appx. 517 (6th Cir. 2011).  There, the ALJ adopted the opinion of a state agency physician who did not review an examining physician's assessment of the plaintiff's physical capabilities before preparing his report.  *Id.* at 520.  The Sixth Circuit remanded the case in part because the ALJ "gave 'no indication' that he 'at least considered' that the state agency physician had not reviewed all of the evidence in the record before giving his opinion significant weight."  *Id.* (citing *Blakley*, 581 F.3d at 409).  When *Blakely* and *Stacey* are considered in light of their facts, the cases are distinguishable.

In both of those cases, the ALJ failed to adequately explain the weight given to treating and examining physicians.  Here, the ALJ made it clear that he gave "some

20

weight" to the opinion of Dr. Klyop.  (Tr. 17.)  In doing so, he did not specifically indicate that he at least considered that Dr. Klyop rendered his opinion in January 2011, before treating physician Dr. Yokiel completed his RFC assessment.  (*Id.*)  As explained above, however, the ALJ provided justifiable reasons for giving less than controlling weight to the opinion of Dr. Yokiel and did not attempt to circumvent the treating physician rule.  Thus, the overriding danger that existed in *Blakely* and *Stacey* – that the ALJ discounted treating and examining source assessments without good reason and instead relied on the opinions of consultants who did not review the entire record – is not present under the facts of Plaintiff's case.

Further, in *Blakely,* the consultative examiner, upon whose opinion the ALJ relied, did not have a complete record before him; that is, he did not have nearly 300 pages of medical records that included not only assessments by treating sources, but ongoing treatment records and notes from those treating sources.  *See [Blakely,* 581 F.3d at 409](#)*.  Here, Plaintiff argues only that Dr. Klyop did not consider Dr. Yokiel's physical functional capacity assessment from November 2011.  (Plaintiff's Brief ("Pl.'s Br.") at 20.)  Dr. Yokiel's 2011 opinion did not include medical findings or treatment notes; rather, it was a questionnaire that related Dr. Yokiel's opinion regarding Plaintiff's physical abilities.  Thus, *Blakely* is distinguishable from the facts here, as this is not a case where the consultative examiners failed to review hundreds of pages of medical records and treatment notes from treating sources.  The *Blakely* Court held: "*[B]ecause much of the over 300 pages of medical evidence reflects ongoing treatment and notes by Blakley's treating sources*, 'we require some indication that the ALJ at least

21

considered these facts before giving greater weight to an opinion that is not "based on a review of a complete case record.""" *Blakely,* 581 F.3d at 409 (emphasis added), citing *Fisk v. Astrue,* 253 Fed.Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-p, 1996 WL 37410, at*3).  This language suggests that the Court's main concern for requiring the ALJ to have at least considered the state consultants' reliance on an incomplete record was due to the volume and type of records that the consultants failed to review.  This is not a concern that is present here.

Moreover, the *Blakely* Court found that the ALJ failed to properly evaluate the medical opinions of the plaintiff's treating physicians.  *Blakely,* 581 F.3d at 407-408. Here, the ALJ adequately explained why he gave less than controlling weight to the opinion of Dr. Yokiel when deciding Plaintiff's RFC.  Importantly, the final responsibility for deciding a claimant's RFC or the application of vocational factors is reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  Thus, given that Dr. Yokiel, Dr. Klyop, and the ALJ all consulted Plaintiff's treatment records before assessing his functional limitations, the fact that Dr. Klyop did not consult the treating source's opinion about Plaintiff's RFC is of no consequence.  The ALJ had the responsibility of determining Plaintiff's RFC and considered the opinions of both a treating source and a non-examining state agency source in doing so.  As the ALJ here provided an adequate analysis of the opinion of Dr. Yokiel and articulated his reasons for assigning less than controlling weight to Dr. Yokiel's opinion, this Court is not faced with the concern that the treating source's opinion was unfairly discounted or ignored altogether.

Unlike *Blakely*, the facts in *Stacey* are not fully developed and the opinion is unpublished.[2] Nonetheless, the instant case is distinguishable from *Stacey* for many of the same reasons that it can be set apart from *Blakely*. In *Stacey,* not only did the ALJ fail to indicate whether he "at least considered" that the state agency physician had not reviewed all of the evidence in the record before giving his opinion significant weight, the ALJ also failed to indicate what weight, if any, he gave to Dr. Randolph, an examining source. *Stacey,* 451 Fed.Appx. at 519. The Court noted, "[w]e have no idea whether the ALJ (1) discounted Dr. Randolph's opinion for valid reasons, (2) discounted Dr. Randolph's opinion for invalid reasons or (3) simply ignored Dr. Randolph's opinion altogether in reaching his conclusion that [Plaintiff] has the residual functional capacity to perform light work." *Id.* The Court further explained: "Making matters worse (or at least heightening the need for explanation) is that [the state agency physician], whose opinion the ALJ accepted, apparently did not review Dr. Randolph's assessment of Stacey's physical capabilities in preparing his report." *Id.* at 520. Here, unlike *Stacey,* the ALJ adequately explained the weight he gave to Dr. Yokiel. While the Court in *Stacey* remanded because it could not tell whether the ALJ rejected the examining source's opinion for legitimate or illegitimate reasons or failed to considered it at all in assessing the plaintiff's RFC, the ALJ in this case provided a thorough assessment of Dr. Yokiel's opinion. As a result, this Court – unlike the *Stacey* Court – is in a position

---

[2]    Unpublished opinions carry no precedential weight, but often carry "persuasive weight." *United States v. Webber,* 208 F.3d 545, 551, n.3 (6th Cir. 2000), citing *Sheets v. Moore,* 97 F.3d 164, 167 (6th Cir. 1996) (noting that unpublished opinions carry no precedential weight and have no binding effect on anyone other than the parties to the actions).

to conclude that the ALJ's assignment of "some weight" to a state agency source is supported by substantial evidence notwithstanding the fact that the source did not consider a subsequent RFC opinion from a treating source.

In this Court's view, both *Blakely* and *Stacey* stand on their own facts.[3]  Thus, this Court will not remand Plaintiff's case on the ground that the ALJ gave some weight to a state agency physician's opinion when that physician did not review the RFC assessment of Plaintiff's treating physician.  Accordingly, Plaintiff's argument is without merit.

Finally, Plaintiff contends that the ALJ erred by applying greater scrutiny to Dr. Yokiel's opinion than he did to Dr. Klyop's opinion.  Plaintiff argues that "[a]lthough the ALJ was quite critical of the alleged inconsistencies between Dr. Yokiel's opinions and other record evidence, his decision does not acknowledge equivalent inconsistencies in the opinion of Dr. Klyop."  (Pl.'s Br. 20.)  Besides this blanket assumption, Plaintiff does not provide examples of the alleged inconsistencies between Dr. Klyop's RFC and the ALJ's RFC, nor does he explain in detail how the ALJ applied greater scrutiny to Dr. Yokiel as opposed to Dr. Klyop.  As a result of failing to explain, develop, or provide an

---

[3]  Plaintiff's use of *Blakely* and *Stacey* to argue that remand is necessary tends to suggest that consultative examiners must always consider the RFC assessments of treating sources when rendering their own opinions. The RFC opinions of treating sources, however, are often rendered after a claimant's case has been heard and the medical records have been considered.  Thus, to require consultative examiners to have reviewed these opinions would be impractical, unworkable, and inefficient.  If courts strictly applied the holdings of *Blakely* and *Stacey* without assessing the cases' unique facts, plaintiffs in future cases could routinely obtain an RFC assessment from a treating source after the consultative examiner reviews the record in a case and thereby undermine the opinions of the consultative examiners.

analytical framework for this assigned error, Plaintiff has waived any argument on this point.  *See* *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).  For the foregoing reasons, Plaintiff has not established a basis for remand of his case.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 13, 2014